### IN THE UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **RON MOHOLT**, | Case No. 3:13-CV-01026-SI |
| Plaintiff, | **OPINION AND ORDER** |
| v. | |
| **DOONEY & BOURKE, INC.**, | |
| Defendant. | |

Judy Danelle Snyder, LAW OFFICES OF JUDY SNYDER, 1000 S.W. Broadway, Suite 2400, Portland, OR 97205; Grant Yoakum, GRANT YOAKUM ATTORNEY AT LAW, 5895 Jean Road, Lake Oswego, OR 97035. Of Attorneys for Plaintiff.

Scott G. Seidman and Colin Love-Geiger, TONKON TORP LLP, 1600 Pioneer Tower, 888 S.W. Fifth Avenue, Portland, OR 97204; Thomas J. McAndrew, THOMAS J. MCANDREW & ASSOCIATES, One Turks Head Place, Suite 205, Providence, Rhode Island, 02903. Of Attorneys for Defendant.

**Michael H. Simon, District Judge.**

Defendant, Dooney & Bourke, Inc. ("Defendant" or "Dooney"), moves for summary

judgment against all claims asserted by Plaintiff, Ron Moholt ("Plaintiff" or "Moholt"). For the

following reasons, Dooney's motion for summary judgment is granted in part and denied in part.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation and quotation marks omitted).

## BACKGROUND[1]

Dooney is a Connecticut-based company that designs, manufactures, and sells high-end handbags and other merchandise. Moholt is an Oregon resident who worked selling handbags and other merchandise for Dooney. In approximately November 2000, Dooney hired Moholt, classifying him as an independent contractor and paying him solely on a commission basis. Dooney terminated its relationship with Moholt in March 2012. There was no written agreement between Moholt and Dooney that defined Moholt's position or his commission structure. Moholt's relationship with Dooney was terminable "at will" by either party.

---

[1] For purposes of summary judgment, the parties have stipulated to these facts.

Moholt served as a non-exclusive sales representative for Dooney in its Pacific Northwest region. Moholt sold Dooney's fashion handbags and related merchandise to accounts in his assigned geographic territory, which initially included such department store chains as Nordstrom, Meier & Frank, and Bon Marché. Moholt earned net commissions for each year in the following amounts: $5,136 for the partial year 2000; $70,171 in 2001; $76,660 in 2002; $125,493 in 2003; $293,828 in 2004; $220,375 in 2005; $337,665 in 2006; $217,683 in 2007; $125,208 in 2008; $89,137 in 2009; $32,369 in 2010; $62,369 in 2011; and $41,571 for the partial year 2012. A "net commission" is a commission after adjustment for any sales with "chargebacks." A chargeback typically would result when a customer returned to Dooney a portion of the product shipped to that customer and Dooney accepted that return. Shipments net of accepted returns are referred to as "net shipments."

During Moholt's tenure, Dooney made a portion of its sales through persons, such as Moholt, whom Dooney classified as independent contractors. During the period covered by Moholt's lawsuit, Dooney also had employees who performed sales responsibilities for Dooney's accounts. These employees worked out of Dooney's corporate headquarters in Connecticut and performed other non-sales functions.

The actual sales work that the Dooney employees performed differed little, if any, from the work performed by the sales representatives who were characterized as independent contractors. The place of performance and the method of compensation, however, differed. During Moholt's tenure, Dooney compensated sales representatives who were characterized as independent contractors solely through a net commission on shipments to the customers' locations (known as "doors") located in the independent contractor's geographic territories, generally at a five percent commission rate, but sometimes lower. For example, if an

independent sales representative was classified as a "sub-representative" on a particular customer's account, he or she would receive only a two percent commission on net shipments made into his or her territory, and the other three percent commission would be paid to the primary independent sales representative for that particular account.

With regard to Dooney's employees who serviced retail accounts, Dooney typically compensated those employees with only a one percent commission rate on net shipments, while also paying those employees a base salary and certain benefits. With only two exceptions, the individuals who were characterized as sales employees worked at Dooney's headquarters and used Dooney-provided equipment.

During his tenure with Dooney, Moholt worked some of the time out of his home office in Oregon, for which he took a personal tax deduction. Moholt typically got up at 6:00 a.m. and began work on his home office computer in his pajamas and robe. Moholt decided when to work from home and when to travel, such as whether and when to visit store locations or customer buying offices, or to meet with prospective new customers. Moholt's work-related travel included: (1) attending meetings with customers that Moholt personally arranged; (2) attending meetings with Dooney's management and staff at times and locations set by Dooney; (3) attending "Market Week" in New York City several times each year, during which Moholt and other sales representatives would also travel to Dooney's headquarters in Connecticut to meet with Dooney's management and staff; and (4) attending or presenting seminars scheduled with key accounts. Moholt scheduled his own time off for vacation and personal days. Dooney set no formal sales quotas for Moholt. Dooney did not provide performance reviews either for independent sales representatives (like Moholt) or for any employees who performed sales functions. Dooney issued Internal Revenue Service ("IRS") W-2 forms to the people whom it

classified as employees and issued IRS 1099 forms to the people, like Moholt, whom it classified as independent contractors.

During Market Week in New York, which occurred about four or five times each year, Dooney would preview the collections for each fashion season, first to the sales representatives and then to the customers. Market Week is an industry-wide activity at scheduled times each year when buyers from Macy's, Nordstrom, Dillard's, and other similar retailers travel to New York for prearranged presentations by Dooney and Dooney's competitors. On Monday of a given Market Week, Dooney would show its new handbag collections to the sales representatives at Dooney's corporate headquarters in Connecticut. Moholt contends that attendance on these days was mandatory, and for purposes of summary judgment Dooney does not dispute Moholt's contention. On Tuesday through Thursday of a given Market Week, Dooney's sales representatives would show the collections to the buyers from their respective territories, at spaces arranged by Dooney in New York City. On Friday of a given Market Week, some of the sales representatives would be invited to reconvene in Dooney's headquarters in Connecticut to discuss the buyers' reactions to different collections and colors, so that Dooney could prepare a sales forecast and begin to schedule manufacturing. Moholt, however, was never invited to these Friday meetings. Instead, Moholt completed his sales forecasts while in New York City, before returning to Oregon.

During one Market Week several years ago, Dooney's President, Peter Dooney, communicated to the sales representatives that they were to dress in appropriate business attire for that Market Week. Peter Dooney used words such as "crisp and clean" or "black and white" to describe this requirement. Moholt always dressed appropriately for whatever function he was attending. Moholt was responsible for showing Dooney's merchandise to the buyers in his

territory; for obtaining commitments from these buyers on styles, volumes, and delivery schedules; for negotiating with customers to extend delivery windows when products could not be shipped within the original schedule; for monitoring inventory at his "doors" and obtaining reorders; and for providing any follow-up services the customers required.

Moholt and the other non-exclusive, independent sales representatives were allowed to represent other products, and some did so. Moholt represented a hosiery line from another manufacturer early in his tenure with Dooney, but that ended in or before 2002. Because of acquisitions, consolidations, and business failures, as well as changes in how manufacturers now do sales, most, if not all, of Dooney's non-exclusive, independent sales representatives currently represent only Dooney.

Moholt paid all of his own expenses during his tenure with Dooney. Moholt's expenses included mileage, hotel, and meal expenses for travel, and home office expenses, such as a computer that Dooney required Moholt to purchase, as well as other office supplies. Moholt also employed at his own expense as many as five independent contractors who worked for Moholt as merchandisers. Moholt's merchandisers visited the "doors" in Moholt's assigned territory to set up displays and check stock for reorders. Moholt paid his merchandisers and issued IRS 1099 forms to them. In addition, Moholt paid employment taxes, local business taxes, and the employer's side of social security taxes both for himself and for the independent contractors (the merchandisers) who worked for him.

Dooney required all independent sales representatives to purchase the same type of computer, which Dooney configured with proprietary software that allowed the sales representatives to access Dooney's databases. During his tenure, Moholt was told he would not be reimbursed for the cost of this computer. In fact, Moholt never submitted any claim for

reimbursement for any of his expenses, and no reimbursement was ever paid to Moholt by Dooney.

For every year that Moholt was a Dooney sales representative, he filed a personal IRS 1040 tax return form, including Schedule C, Profit and Loss. This was a change in Moholt's tax status from when he was classified as an employee for another company before joining Dooney in 2000. After becoming affiliated with Dooney in November 2000, Moholt deducted all of his business expenses "off the top," rather than as miscellaneous itemized deductions on Schedule A, which would have limited his deductions to amounts greater than two percent of his adjusted gross income. Moholt used the same accountant during his tenure with Dooney that he used before beginning his affiliation with Dooney. After Moholt began working for Dooney, Moholt's accountant filed Moholt's tax returns showing Moholt's income as being received from a sole proprietorship, rather than as wages. Moholt's accountant did this because Moholt received an IRS form 1099 from Dooney showing miscellaneous income, rather than a W-2 form showing wages and because Moholt was responsible for all of his own expenses, including paying the merchandisers whom Moholt hired as independent contractors to work for him.

Dooney's independent sales representatives, including Moholt, regularly recruited new accounts for Dooney, which retained the final authority for deciding whether to approve a new account. Dooney set the wholesale prices for its products, and sales representatives had no authority to negotiate a different price for any customer. Dooney also had sole authority for authorizing a credit to a customer. When Dooney authorized a credit, a chargeback would result in the sales representative losing his or her commission to the extent of the chargeback.

All of Moholt's electronic communications with the Dooney accounts that he served were done using his personally owned cell phone and computer, unless he was in the Dooney

showroom in New York City or in Dooney's corporate headquarters in Connecticut. Dooney provided a voicemail box and email address for Moholt on Dooney's central server to allow customers the convenience of leaving messages for Moholt in a dedicated location. Moholt accessed his voicemail and email using his own cell phone or computer. Dooney also provided its sales representatives with Dooney-branded badges for their merchandisers to wear when visiting customer stores.

Dooney developed a set of best practices based on what some of the most successful sales representatives were doing. Among these best practices was a schedule for how often merchandisers should visit individual stores to ensure that displays were properly set up and to check on inventory for reordering, based on the volume of Dooney sales each store generated (the greater the volume, the more frequent the visits). Under these best practices, Dooney paid Moholt a bonus to be given to the merchandisers he employed if they fulfilled the standards established by Dooney.

Nordstrom has long been one of Dooney's most important customers because of the influence it exerts in fashion retailing. Nordstrom was one of the major Dooney accounts that Moholt serviced. As with several larger national and regional customers of Dooney's, Nordstrom was a "shared account" that was serviced by more than one person affiliated with Dooney. Moholt was responsible for the Nordstrom "doors" in the Pacific Northwest and Hawaii. Bill Tripodi, also classified by Dooney as an independent contractor, was the sales representative responsible for the Nordstrom "doors" in California and Arizona. During Moholt's tenure, Dooney generally paid Moholt a five percent commission on net shipments to the Nordstrom "doors" located in his territory, and Dooney paid Tripodi a five percent commission on net shipments to the Nordstrom "doors" in Tripodi's territory.

PAGE 8 – OPINION AND ORDER

The Nordstrom Rack, Inc. ("Nordstrom Rack" or the "Rack") is Nordstrom's "discount arm." For many years, Nordstrom urged Dooney to sell to the Nordstrom Rack. And for many years, Dooney resisted because it was more profitable for Dooney to sell its discounted merchandise through Dooney's own retail outlet stores. In 2009, however, Dooney began selling to the Nordstrom Rack. The Nordstrom Rack became a "house account" for one of Dooney's employees. That employee asked Moholt to provide support service for shipments made to the Nordstrom Rack stores located in Moholt's territory, which Moholt did for three selling seasons, from spring 2009 to fall 2010. In this lawsuit, Moholt seeks one half of his regular commission rate, or two and one-half percent, on net shipments that Dooney made to the Nordstrom Rack in Moholt's territory during this period. This amount totals $33,130.68. Moholt's first month of claimed "Nordstrom Rack commissions" is February 2009, and Moholt seeks $2,147.60 for net shipments by Dooney to the Nordstrom Rack made that month, based on a commission rate of two and one-half percent.

During Moholt's tenure, Dooney sold to discounters Marshalls, T.J. Maxx, and Stein Mart, in addition to the Nordstrom Rack. In most instances, Dooney did not pay commissions on sales to discounters, but it did pay a reduced commission of two and one-half percent to Bob Goodwyn, also classified by Dooney as an independent contractor, on sales made to Stein Mart for a period of time after Goodwyn brought in the Stein Mart account.

No one at Dooney ever told Moholt that he would be paid commissions at two and one-half percent, or at any other rate, on shipments to the Nordstrom Rack in his territory. Moholt says that he did not know that he would not receive Nordstrom Rack-related commissions until the second month of his servicing the Nordstrom Rack, March 2009. Moholt continued to service

the Nordstrom Rack account, however, because he believed it was a condition of his ability to

retain the Nordstrom account, for which he did receive commissions.

After Dooney ended its relationship with Moholt in 2012, Bill Tripodi became the

Nordstrom account independent sales representative for the entire United States. In spring 2013,

Dooney restructured its system of paying Nordstrom commissions. As part of this restructuring,

Dooney began paying Tripodi a commission of one percent on net shipments to the Nordstrom

Rack nationally. Bob Goodwyn and another Dooney sales representative also began to receive

commissions on sales to the Nordstrom Rack. Dooney made this change retroactive to January 1,

2013.

Moholt contends that he should have been classified as an employee for the period

January 1, 2007 through March 2012.[2] Based on this contention, Moholt seeks $198,828 in

"expense" reimbursements. The parties agree for purposes of summary judgment that, if Moholt

had been an employee, he would have been reimbursed certain expenses or received certain

benefits. He also would have been paid a lower sales commission by Dooney.

## DISCUSSION

**A.  Moholt's First Claim for Relief (Unpaid Wages)**

### 1.  Wage Claim – Part One ("Additional Nordstrom Commissions")

Moholt titles his First Claim for Relief "Unpaid Wages." Moholt then divides that claim

into two parts. For his "Wage Claim – Part One," Moholt contends that he is entitled to be paid

commissions for sales activities involving certain shipments of Dooney product to Nordstrom,

Inc. during the period January 2007 through March 2012. Although Dooney paid Moholt

---

[2] Moholt does not contend that any particular event relevant to this lawsuit occurred as of
January 1, 2007. Instead, this date appears to be used solely for purposes of applying a six-year
statute of limitations. Moholt filed his lawsuit in state court on May 31, 2013. Dooney then
timely removed the case to federal court.

commissions for sales activities related to many shipments of Dooney product to Nordstrom, Inc. during this period, Moholt contends that he was entitled to certain additional Nordstrom commissions. The parties refer to this contention as Moholt's claim for "Additional Nordstrom Commissions." After Dooney moved for summary judgment, Moholt conceded that summary judgment is appropriate against his claim for Additional Nordstrom Commissions. Accordingly, summary judgment is granted in favor of Dooney and against Moholt on his First Claim for Relief, Wage Claim – Part One, relating to Additional Nordstrom Commissions.

## 2. Wage Claim – Part Two ("Nordstrom Rack Claim")

For his "Wage Claim – Part Two," Moholt contends that he is entitled to be paid commissions for sales activities involving shipment of Dooney products to the Nordstrom Rack during the period February 2009 through March 2010. The parties refer to this contention as Moholt's "Nordstrom Rack Claim." Moholt seeks approximately $33,131 in commissions, which is calculated at a commission rate of two and one-half percent multiplied by $1,325,227 in total orders shipped to the Nordstrom Rack during the relevant period. Dooney moves for summary judgment against Moholt's Nordstrom Rack Claim. Moholt opposes this motion.

Dooney classified and treated Moholt as an independent sales representative. Dooney argues, without opposition by Moholt, that Oregon does not have any law expressly governing how manufacturers are required to compensate independent sales representatives. In addition, argues Dooney, even if Moholt should have been classified as an employee, nothing in Oregon or federal wage law requires an employer to pay a commission on every sale made by a sales employee. Moholt offers nothing to the contrary.

Dooney argues that regardless of whether Moholt was an independent contractor or an employee, it is undisputed that Moholt's relationship with Dooney was terminable "at will" by either party. Dooney further argues that no one from Dooney ever told Moholt that he would be

PAGE 11 – OPINION AND ORDER

paid commissions on sales or shipments made to any discounter, such as the Nordstrom Rack. Dooney adds that Moholt admits that he knew at least after the first month of providing service to the Nordstrom Rack, which he began doing in February 2009, that he would make no commissions on sales to that business and Moholt nevertheless continued to do the work.

In its motion, Dooney relies upon *Albrant v. Sterling Furniture Co.*, 85 Or. App. 272, 726 P.2d 201 (1987). In that case, the Oregon Court of Appeals held that if an employer may terminate an at-will employee at any time,

> [i]t follows that an employer may also modify the employment contract so long as the modification applies only prospectively. An employe[e] impliedly accepts such modifications by continuing employment after the modification. *Page v. Kay Woolen Mill Co.*, 168 Or. 434, 439, 123 P.2d 982 (1942); *see also Mail-Well Envelope Co. v. Saley*, 262 Or. 143, 152, 497 P.2d 364 (1972).

*Albrant*, 85 Or. App. at 275 (footnote omitted); *see also Duncan v. Office Depot*, 973 F. Supp. 1171, 1177 (D. Or. 1997) (holding that an employer has the right to modify the terms and conditions of an at-will relationship prospectively at any time).

In response, Moholt makes two arguments. First, Moholt argues that he had a reasonable contractual expectation that Dooney would pay him commissions for the sales and services he provided on the Nordstrom Rack account. Moholt bases this expectation, in part, on Dooney's practice of paying commissions to Moholt at rates between two and one-half percent and five percent, depending on various factors, since Moholt began his affiliation with Dooney in November 2000. Moholt adds that his expectation was also based on his knowledge that Dooney previously had paid Bob Goodwyn commissions for his sales and service to the discount retailer Stein Mart. Second, Moholt argues that under Oregon law every contract contains an implied covenant of good faith and fair dealing and that there are genuine issues of material fact

regarding whether Dooney acted in good faith in not paying Moholt any commissions on sales and shipments made to the Nordstrom Rack.

The parties agree that Moholt began working for Dooney as a sales representative in November 2000. Stipulation of Facts, ¶ 1. Whether Moholt was properly classified as an independent contractor (as Dooney contends) or should have been classified as an employee (as Moholt contents) is not relevant to Moholt's Nordstrom Rack Claim. The parties also agree that during Moholt's tenure, sales representatives who were classified as independent contractors were paid a commission "generally at a 5% rate, but it was sometimes lower." Stipulation of Facts, ¶ 5. The parties further agree that "[t]here was no written agreement between Moholt and Dooney & Bourke to define Moholt's position or the commission structure." Stipulation of Facts, ¶ 1. And the parties agree that their relationship was terminable at will. Stipulation of Facts, ¶ 11.

Moholt states in his declaration that Dooney instructed him in 2009 to assist in making sales to the Nordstrom Rack account. Moholt complied and, he states, expected to be paid for that work. As he explains in his declaration: "When I performed work for Dooney at Nordstrom Rack, I expected to be compensated for that work." Decl. of Ron Moholt, p. 7, ¶ 24 (Dkt. 43). Moholt adds:

> My expectation that I would receive a Nordstrom Rack commission was based on my knowledge of a Dooney policy or practice of paying "half commission" or 2.5% on "close-out" or "discounted" items, i.e. at Stein [M]art and T.J. Maxx. Due to the historic delay by Dooney in making commission adjustments, I was not alarmed that commission for my work on the Nordstrom Rack account did not immediately appear on my paycheck. I knew that sales representative Bob Goodwyn had been paid for his work at the Stein [M]art stores, another retail discounter similar to Nordstrom Rack, so I was aware of the precedent within Dooney for paying commission on discount retailers. I persisted in my attempts to be paid my commissions for work on Nordstrom Rack until I was terminated from employment by Dooney.

*Id.* at ¶25.

PAGE 13 – OPINION AND ORDER

Moholt began performing work on the Nordstrom Rack account in February 2009, and he expected to receive his first month of Nordstrom Rack commissions for that work shortly thereafter. Stipulation of Facts, ¶ 31. When Dooney issued Moholt's commission statement in March 2009, during Moholt's second month of his involvement with the Nordstrom Rack, Moholt learned that Dooney would not be paying any commissions to him on sales or shipments made by Dooney to the Nordstrom Rack; Moholt, however, continued to serve the Nordstrom Rack account because "he believed it was a condition of his ability to retain the Nordstrom account," for which he was paid commissions. *Id*. at ¶ 33. The Nordstrom account is a different Dooney account than the Nordstrom Rack account.

Moholt testified in his deposition as follows:

> Q.    How did you learn you weren't getting paid commissions on Nordstrom Rack?
>
> A.    When the commissions come out.
>
> Q.    So after the first commission statement came out and you didn't get paid from Nordstrom Rack, you knew that going forward that you weren't getting paid commissions on Nordstrom Rack?
>
> A.    From that point, yeah.
>
> Q.    Did you seek an explanation for that?
>
> A.    I asked to be paid.
>
> Q.    What were you told? Well, first of all, who did you ask?
>
> A.    Mr. Kinsley [Dooney's Chief Financial Officer, Phil Kinsley; Stipulation of Facts, ¶ 29].
>
> Q.    Okay. You asked Phil Kinsley "I want to be paid on Nordstrom Rack." What commission rate did you tell him you wanted to be paid?
>
> A.    Half commission.
>
> Q.    How did you come up with half commission?

A.      Usually on closeouts or other things they would pay half
        commission.

Q.      When you say "closeouts" are you talking about sales to
        your regular customers?

A.      Every once in a while Dooney would offer accounts at
        closeout or different kinds of products that are done and
        that kind of stuff and the rep would be paid half
        commission.

Q.      Did Mr. Kinsley respond to your question about getting
        paid 2.5 percent commissions on Nordstrom Rack?

A.      He told me "We don't pay discount," "We don't pay
        commission on discounters and I cannot pay you."

Q.      Okay. Did anyone at Dooney & Bourke ever communicate
        to you that they had changed that position and were going
        to pay commissions on Nordstrom Rack?

A.      You mean while I was there?

Q.      Yeah, while you were there.

A.      No, but I was still asking. I was doing all the work and stuff
        and I kept on asking to get paid.

Q.      Nobody ever told you you were going to get paid, correct?

A.      No they did not.

Decl. of Judy Danelle Snyder, Ex. G, p. 27, Tr. 135:20-137:14 (Dkt. 42-7).

        Viewing the evidence in the light most favorable to Moholt and giving Moholt the benefit

of all reasonable inferences, Moholt's evidence is sufficient to show a genuine issue of material

fact regarding whether, when Dooney first asked Moholt to work on the Nordstrom Rack

account in early 2009, Moholt believed that he would be paid a "half commission" for that work

computed on sales made to the Nordstrom Rack. Dooney contends that Moholt's servicing the

Nordstrom Rack was simply part of his job duties serving Nordstrom, for which he was paid a

full commission, but based only on sales made to Nordstrom and not to the Nordstrom Rack.

PAGE 15 – OPINION AND ORDER

With regard to Moholt's first month working on the Nordstrom Rack account, there is a genuine dispute concerning the terms of the parties' agreement, requiring resolution by a jury. Thus, Dooney's motion for summary judgment is denied with respect to Moholt's Nordstrom Rack Claim for February 2009 commissions in the approximate amount of $2,147.60.

The situation changed, however, in March 2009. At that time, Moholt was expressly told by Dooney's Chief Financial Officer, Phil Kinsley, that Dooney would not pay Moholt any commissions relating to shipments of product to the Nordstrom Rack. After that time, any work that Moholt did relating to the Nordstrom Rack was performed by him without Dooney incurring any legal obligation to pay Moholt anything beyond his regular commission structure related to serving Nordstrom.

In an "at will" employment relationship, "an employer is free to set the terms and conditions of the work and compensation and . . . the employee may accept or reject those conditions." *Brett v. City of Eugene*, 130 Or. App. 53, 57, 880 P.2d 937 (1994). "By continuing to work for an employer after the employee is aware of a change in the employer's policies, the employee impliedly accepts the change in his or her employment contract." *Id*. Thus, at least after Moholt learned in March 2009 from Kinsley that Dooney would not be paying any commissions relating to sales made to the Nordstrom Rack, Moholt's continued work for Dooney represents his implied acceptance of that policy.

Moholt's second argument is based on the proposition that under Oregon law, every contract contains an implied duty of good faith and fair dealing. *Klamath Off-Project Water Users, Inc. v. PacifiCorp*, 237 Or. App. 434, 445, 240 P.3d 94 (2010). Moholt's argument is unavailing.

Regardless of whether Moholt is properly classified as an independent contractor or as an employee, there is no dispute that this relationship was terminable at will by either party. Thus, either party may unilaterally modify the prospective terms of the relationship at any time without becoming subject to a claim for breach of the duty of good faith. *See Duncan*, 973 F. Supp. at 1177 (holding that because an employer has the "right to modify the terms and conditions of [an at-will employment agreement] prospectively at any time," the duty of good faith and fair dealing is not breached when an employer unilaterally modifies the prospective terms of an employment agreement). In addition, "it is only the objectively reasonable expectations of parties that will be examined in determining whether the obligation of good faith has been met." *Tolbert v. First Nat'l Bank of Oregon*, 312 Or. 485, 494, 823 P.2d 965 (1991); *see also Arnett v. Bank of America, N.A.*, 874 F. Supp. 2d 1021, 1034-35 (D. Or. 2012) (discussing the evolution of the law in Oregon concerning the implied covenant of good faith and fair dealing). [3] After speaking with Dooney's Chief Financial Officer, Mr. Kinsley, in March 2009, Moholt could not have held any reasonable expectation that Dooney would be assuming any legal obligation to pay Moholt any commissions related to the Nordstrom Rack account, at least unless and until Dooney expressly communicated such a change in its policy—which it did not do during Moholt's tenure. [4]

As stated above, Dooney's motion for summary judgment on Moholt's First Claim for Relief, Wage Claim – Part Two, relating to Moholt's Nordstrom Rack Claim, is denied to the

---

[3] Although Moholt did not explicitly plead the duty of good faith and fair dealing in his Complaint but raises it for the first time in opposition to Dooney's motion for summary judgment, the Court addresses the issue because "the duty is implied in every contract, and the alleged breach of the duty is the same as the alleged breach of contract." *Duncan*, 973 F. Supp. at 1177.

[4] The fact that Dooney changed its policy in the spring of 2013, after Moholt's termination in March 2012, and began paying commissions based on shipments made to the Nordstrom Rack (Stipulation of Facts, ¶ 34) has no relevance to Moholt's claim of a legal entitlement to Nordstrom Rack commissions during his tenure.

extent of Moholt's demand for February 2009 Nordstrom Rack commissions in the approximate amount of $2,147.60. Dooney's motion for summary judgment is granted, however, on the balance of Moholt's First Claim for Relief, Wage Claim – Part Two, namely Moholt's demand for Nordstrom Rack commissions related to work that Moholt performed for that account beginning March 2009.

**B.  Moholt's Second Claim for Relief (Statutory Penalty for Unpaid Wages)**

For his Second Claim for Relief, Moholt seeks a statutory penalty under Or. Rev. Stat. § 652.150 based on Dooney's failure to pay the amounts sought in Moholt's first claim. All that remains for trial, however, concerning Moholt's first claim is his Nordstrom Rack Claim (Wage Claim – Part Two) to the extent of his demand for February 2009 Nordstrom Rack commissions in the approximate amount of $2,147.60.

Or. Rev. Stat. § 652.150(1) provides for a penalty if, on termination of employment, "an employer willfully fails to pay any wages or compensation of any employee whose employment ceases." This penalty is limited to 30 days' wages. Or. Rev. Stat. 652.150(1)(a). This sub-section also states: "as a penalty for the nonpayment, the wages or compensation of the employee shall continue from the due date thereof *at the same hourly rate for eight hours per day* until paid or until action therefor is commenced." Or. Rev. Stat. 652.150(1) (emphasis added).[5]

By its own terms, the penalty provision in Or. Rev. Stat. 652.150 only applies to employees, and not to independent contractors. Thus, for purposes of Moholt's Second Claim for Relief, the Court must decide whether Moholt is an employee or an independent contractor as a matter of law or whether the facts require resolution by a jury.

---

[5] The parties have not briefed how, or even whether, this measurement might apply to Moholt's Nordstrom Rack Claim for February 2009 commissions if Moholt prevails on that claim. This is not an issue, however, that needs to be resolved at this time.

As opposed to claims brought under Or. Rev. Stat. Chapter 653, where the "economic realities" test applies, for claims brought under Or. Rev. Stat. Chapter 652 the applicable test for deciding whether a worker is an employee or an independent contractor is the "right-of-control" test and not the "economic realities" test. *See Slayman v. FedEx Ground Package System, Inc.*, 765 F.3d 1033, 1042 (9th Cir. 2014), citing *Cejas Commercial Interiors, Inc. v. Torres-Lizama*, 260 Or. App. 87, 100-101, 316 P.3d 389 (2013).[6] "Oregon's right-to-control test requires courts to weigh four factors: (1) direct evidence of the right to, or exercise of, control; (2) the furnishing of tools and equipment; (3) the method of payment; and (4) the right to fire." *Id*. at 1042 (quotation marks and citation omitted). "Direct evidence of the right to control is the most important factor under Oregon law." *Id*. In addition, "[t]he test for determining whether one is a servant or an independent contractor is not the actual exercise of control—the actual interference by the employer with the manner and method of accomplishing the result—but the right to interfere." *Nordling v. Johnston*, 205 Or. 315, 332, 283 P.2d 994 (1955).

Considering first the direct evidence of Dooney's right to control Moholt's manner and method of accomplishing the result of making sales of Dooney's product line, Moholt set his own hours, chose to work out of his home office, determined what to wear (at least when he wasn't visiting customers), decided when and how frequently to contact customers, determined whether to contact customers by telephone, email, or personal visit, and hired his own merchandisers and decided how much to pay them. In addition, Moholt was allowed to, and for a

---

[6] Without citing to any authority, Dooney asserts that the "economic realities" test applies "for purposes of determining whether attorney's fees or penalty wages are available for his wage claims" under Moholt's First and Second Claims for Relief. Def.'s Mot. for Sum. J. at p. 32 n.29 (Dkt. 35). The Court disagrees based on the statements in both *Cejas* and *Slayman* that the "right-to-control" test applies to claims brought under Or. Rev. Stat. Chapter 652.

time did, represent other product lines, at least when those lines were not in competition with Dooney's own products.

There is, however, also evidence of some control by Dooney. Moholt was required to purchase a specific computer from Dooney and to use Dooney's proprietary software for managing the orders of Dooney product. In addition, Moholt was expected to be in New York during Market Week four or five times each year and, at least when seeing customers during Market Week, Dooney required Moholt to dress "clean and sharp" or "black and white." Moholt also was expected to attend in person or by telephone certain management and staff meetings at times and locations set by Dooney. Moholt also was assigned by Dooney to a specific geographic territory, the Pacific Northwest. Further, Dooney required Moholt to assist in the servicing of the Nordstrom Rack account without receiving any additional compensation as a condition of Dooney being able to continue to sell to and earn commissions from shipments to Nordstrom, Inc. Dooney also retained final approval authority over any new customers that sales representatives, including Moholt, brought to Dooney. In fact, on several occasions Moholt brought prospective new customers to Dooney, and Dooney rejected them. In addition, sales representatives were not authorized to grant discounts to customers without approval from Dooney. Finally, Dooney retained sole authority to determine which customer returns to accept, and this would affect the level of chargeback deductions from a sales representative's commissions.

Notwithstanding these indicia of control, other facts show that Dooney afforded Moholt with extensive freedom and discretion in the manner and method of performing his work. On balance, the "right to control" factor favors Dooney, but not unambiguously. *See generally Jenkins v. AAA Heating & Cooling, Inc.*, 245 Or. 382, 386, 421 P.2d 971 (1966) ("[T]he exercise

PAGE 20 – OPINION AND ORDER

of some limited control by the employer over the work being done will not necessarily make the worker an employee rather than an independent contractor.").

Considering next the factor, relating to the furnishing of tools and equipment, this factor also favors Dooney, but again not unambiguously. Dooney provided Moholt with business cards, name badges, a voicemail mailbox, and an email account. Moholt, however, furnished all of his other tools and equipment. This included home office space, home office supplies, a cell phone, postage, samples, and business gifts. In addition, Moholt hired and paid his own independent contractors (the merchandisers) to help service customers in Moholt's territory. Although Dooney required Moholt to provide service to the customers in his territory, Dooney did not require Moholt to do so by hiring others to perform that work. Moholt could have done it himself. Further, although it seems unusual to speak of such independent sub-contractors as Moholt's "tools and equipment," that is the role they served. Moreover, it is even more unusual to consider that an employee may hire other people to assist (or even wholly perform) that employee's job duties and then expect the employer not only to continue to pay the employee's wages but also to be legally obligated to reimburse the employee for the wages and other expenses of those other people. Yet, that is precisely what Moholt is seeking in this case.

Turning next to the "method of payment" factor, this factor either favors Dooney or is neutral. Moholt agrees that under his arrangement with Dooney, which was in place from November 2000 through March 2012, Moholt's only compensation from Dooney was in the form of a sales commission based on net shipments, generally at five percent, and that Moholt would be responsible for paying all of his own expenses.[7] Thus, how much Moholt earned was

---

[7] Moholt has not claimed that Dooney violated any federal or state laws requiring the payment of a minimum wage or overtime or unlawfully took any deductions from Moholt's compensation.

largely within his own control, depending upon how hard he chose to work and how successful

his own sales abilities and efforts (and those of his merchandiser-independent contractors)

proved to be. Moholt received no salary, no benefits package, and no withholding of taxes from

Dooney.

The final factor concerns the right to fire, and this factor favors Moholt. The parties'

relationship was "at will," meaning that either Moholt or Dooney could end the relationship at

any time and for any reason. Generally, a relationship that is terminable at will is consistent with

an employer-employee relationship. Oregon courts, however, have held that the right to fire is

not dispositive on the question of whether someone is an employee or an independent contractor.

*See, e.g.*, *Avanti Press v. Employment Dept. Tax Sec.*, 248 Or. App. 450, 472, 274 P.3d 190

(2012) ("We are not persuaded, however, that the right to fire is dispositive in this case."); *Schaff*

*v. Ray's Land & Sea Food Co.*, 334 Or. 94, 106, 45 P.3d 936 (2002) (holding that a dealer was

an independent contractor, not an employee, notwithstanding that their relationship was

terminable at will); *Jenkins*, 245 Or. at 385 (affirming directed verdict holding that a salesman

who was the driver of an automobile that caused personal injury was an independent contractor

and not an employee of the defendant, notwithstanding the fact that the defendant and the

salesman could terminate their relationship "at any time, for any reason").

"Whether an individual is an employee or an independent contractor is a legal

conclusion." *Schaff*, 334 Or. at 99. Here, there is no genuine issue of any material fact, in the

sense of a historical or evidentiary fact. The question remains, however, whether a jury should be

permitted to draw inferences from these undisputed historical facts and thereby, for all practical

purposes, decide the legal question of whether Moholt was an employee or an independent

contractor.

This question was discussed extensively in *Schaff*. As now-Chief Justice Balmer explained, writing for the Court:

> In summary, the foregoing discussion of this court's case law establishes that whether an individual is an employee or an independent contractor for vicarious liability purposes is a question of law. However, that legal conclusion ultimately depends on a constellation of facts relating to the right to control. A jury or other factfinder must render a verdict on an individual's employment status if the facts and any reasonable inferences that the jury could draw from those facts support a conclusion that the putative employer had the right to control the putative employee's work performance. *See Wallowa Valley Stages*, 235 Or. [594], 600, 386 P.2d 430 (jury selects between conflicting inferences in arriving at general verdict). If the facts and any reasonable inferences that a jury could draw from those facts would not support a conclusion that the putative employer had the right to control the putative employee's work performance, then there is no triable issue of fact, and a defendant is entitled to have the issue decided as a matter of law. *Jenkins*, 245 Or. at 386. The court's determination may come in the form of a ruling on a motion for a directed verdict, as in *Jenkins*, or a ruling on a motion for summary judgment, as here.

*Id*. at 103 (affirming summary judgment holding that dealer was an independent contractor rather than an employee). The Oregon Supreme Court in *Schaff* also instructed that "the absence of control may be found, as a matter of law, despite evidence of one or more of the subsidiary factors." *Id*. at 105. After considering all of the factors applicable under the "right to control" test, which applies in claims brought under Or. Rev. Stat. Chapter 652, the Court finds that a reasonable jury could draw from the undisputed facts either the conclusion that Moholt was an independent contractor working for Dooney or that he was a Dooney employee. Dooney's motion for summary judgment is, therefore, denied on Moholt's Second Claim for Relief.

**C.  Moholt's Third Claim for Relief (Breach of Contract)**

For his third claim for relief, Moholt alleges breach of contract. Moholt contends that Dooney misclassified Moholt as an independent contractor rather than as an employee and then breached a contractual obligation owed by Dooney to its employees to pay "employer share

expenses" for Moholt throughout the course of Moholt's employment with Dooney.[8] The parties

refer this contention as Moholt's "Claim for Expense Reimbursements or Employee Benefits."

Moholt seeks approximately $198,678 for this claim. Dooney moves for summary judgment

against this claim, and Moholt opposes this motion.

Dooney argues that Moholt was properly classified as an independent contractor, that

even if Moholt was misclassified he has not suffered any loss from being classified as an

independent contractor rather than as an employee, and that Moholt's claim is barred by the

applicable statute of limitations. Finally, as an additional defense, Dooney asserts the doctrine of

equitable recoupment. Dooney argues that under this doctrine, if Moholt were found to have

been improperly classified as an independent contractor, Dooney may reduce Moholt's damages

resulting from that misclassification with any overpayment of commissions paid by Dooney,

beginning when Moholt first began his affiliation with Dooney in 2000. Moholt responds that if

any recoupment or offset were allowed to reduce his damages, it must be limited to the period of

Moholt's claim, 2007-2012.

Although the parties sometimes refer to Moholt's third claim as a "claim for expense

reimbursements or employee benefits," Moholt's Complaint labels this claim as one for "breach

of contract," and Moholt does not rely upon any federal or Oregon statute to provide the legal

basis for his third claim. Thus, the Court analyzes Moholt's third claim as alleging a breach of

contract under Oregon common law.

---

[8] Some of the categories of "employer share expenses" for which Moholt seeks recovery
include automobile expenses, equipment, office expenses (including supplies), travel expenses
(including hotel and airfare), business gifts, merchandisers (the independent contractors hired by
Moholt to assist him), parking and tolls, postage, samples, telephone and internet, and home
office "rent." Other categories of reimbursement sought by Moholt are "self-employment taxes"
and "Tri-Met" business taxes. *See* Stipulation of Facts, Exhibit 1 (Dkt. 33-1).

### 1.   First Principles Under Oregon's Common Law of Contracts

Whether Dooney is liable to Moholt for breach of contract is a question to be decided under contract law, and both parties treat this matter as governed by Oregon law. *See* Pltf's. Mem. Opp. Sum. J. at 16 (Dkt. 41). If Moholt was properly classified by Dooney as an independent contractor, then contract law governs their relationship. But, even if Moholt were not properly classified as an independent contractor and should have been considered as an employee, then contract law still governs their relationship. That is because the relationship of employer and employee is "basically one of contract." *Snow v. West*, 250 Or. 114, 115, 440 P.2d 864 (1968).

In a lawsuit brought by a former employee against a former employer alleging breach of contract, the Oregon Court of Appeals, in an opinion written by then-Court of Appeals Judge Gillette, wrote:

> What the complaint does allege is a straightforward breach of contract claim. It sets out the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff. The complaint is sufficient to state a claim under contract law principles. Defendant seems to assume that something about the employment nature of the contract changes the normal rules. Defendant is incorrect. A breach of contract is a breach of contract, unless specific statutes or public policies affect the contract in some fashion. Defendant has shown no way in which they do so here.

*Fleming v. Kids & Kin Head Start*, 71 Or. App. 718, 721, 693 P.2d 1363 (1985). In *Flemming*, the court also noted: "In the absence of statutory or public policy considerations, there is nothing about being an employer that gives a contracting party rights that it would not have if it were the buyer [or seller] of widgets instead of labor." *Id.* at 723. In addition, unless there are defenses under the statute of frauds (which are not applicable here), an oral contract is just as enforceable as a written one, provided that the intent of the parties is ascertainable. *See Langendorf United*

*Bakeries, Inc. v. Moore*, 327 F.2d 592, 596 (9th Cir. 1964) ("The reasonable intent of the parties was ascertainable. Under such circumstances destruction of the contract for uncertainty is to be avoided.").

The proponent of an alleged contract has the burden of establishing both its existence and its terms. *Holdner v. Holdner*, 176 Or. App. 111, 120, 29 P.3d 1199 (2001). In addition, "[i]n determining whether a contract exists and what its terms are, we examine the objective manifestations of intent, as evidenced by the parties' communications and acts." *Id*. at 120 (citation and quotation marks omitted).

Moholt and Dooney agree that an oral contract terminable at will existed between them. In addition, Dooney does not deny Moholt's full performance and lack of breach. Where the parties disagree is in the identification of the essential terms of that contract and whether Dooney breached any of those terms. The latter question will be relatively easy to answer after the former question has been resolved. Finally, the parties disagree over the proper remedy, including any offsets or recoupment that may be available to Dooney, in the event that Dooney is found to be in breach. Thus, the Court turns next to identifying the contract's essential terms.

### 2.  The Contract's Terms as Evidenced by the Parties' Communications and Acts

As stipulated by the parties, in approximately November 2000, Dooney hired Moholt, classifying him as an independent contractor and paying him solely on a commission basis. The parties further agree that there was no written agreement defining Moholt's position or his commission structure and that the relationship between Moholt and Dooney could be terminated at any time by either party. The parties also agree that Moholt paid all of his own expenses, including employing at his own expense as many as five independent contractors (the merchandisers) to help Moholt service the accounts for which he was receiving commissions from Dooney. Although Moholt incurred substantial travel and home office expenses, Moholt

never submitted any claims for reimbursement for any of his expenses to Dooney during his tenure. Moreover, Dooney never paid or reimbursed or promised to pay or reimburse Moholt for any of these expenses. In fact, at one point in their relationship, Dooney required that Moholt purchase a computer from Dooney, and Dooney told Moholt that he would not be reimbursed for its cost. Moholt purchased the computer and did not seek reimbursement. The relationship between Dooney and Moholt continued in this manner for more than 11 years, until Dooney terminated the relationship in March 2012.

Based on the parties' stipulations of fact, the Court finds that, looking only at the parties' communications and acts, an oral agreement, terminable at will by either party, was reached between Moholt and Dooney in approximately November 2000. The Court further finds that the essential terms of this agreement were that Moholt would be classified and treated as an independent contractor working as a sales representative for Dooney, that Moholt would be responsible for all of his expenses, and that Dooney would pay Moholt solely on a commission basis based on net shipments, generally at a commission rate of five percent but potentially lower under certain circumstances.

Aside from the dispute concerning Moholt's Nordstrom Rack claim, which is treated in Moholt's First Claim for Relief, both Moholt and Dooney complied with all of the essential terms of their oral agreement, and Dooney terminated this "at will" relationship after 11 years in March 2012. For purposes of Moholt's Third Claim for Relief, Moholt alleges that Dooney breached the parties' oral agreement by failing to pay or reimburse Moholt certain expenses, which Moholt calls "employer share expenses." The Court finds, however, that, at least based on the parties' communications and acts, Dooney never promised to pay or reimburse Moholt for these "employer share expenses" (or what Dooney sometimes calls Moholt's claim for "expense

reimbursements or employee benefits"). Thus, based solely on the parties' communications and acts, Dooney did not breach the parties' oral agreement by failing to pay these expenses or to reimburse Moholt for them.

### 3. Moholt's *Rose City* Contract Theory

Moholt, however, does not appear to contend that Dooney ever expressly agreed to pay or reimburse Moholt for the alleged "employer share expenses." Instead, Moholt appears to be making an "implied in fact" contractual argument, although without applying that label to his argument. In his Complaint, Moholt alleges that he was an employee "as a matter of law," Complaint, ¶ 5, and his response in opposition to Dooney's motion for summary judgment attempts to support that conclusion. Moholt then presents his argument that under Oregon and federal law, Dooney "misclassified" him as an independent contractor, when he should have been classified as an employee. This is step one of Moholt's "implied in fact" contract argument.

At step two of his argument, Moholt alleges, and offers some factual support, that Dooney has paid some or all of the "employer share expenses" on behalf of those persons whom Dooney has classified as employees. Moholt also alleges Dooney pays these "employer share expenses" as part of a company plan or policy. *See* Complaint, ¶ 17. In fact, Dooney has stipulated for summary judgment purposes that if it would have classified Moholt as an employee, Dooney would have paid for many (but not all) of the expenses that Moholt claims as "employer share expenses." Stipulation of Facts, ¶ 15.

At step three of his argument, Moholt alleges that he "was aware" that Dooney paid "employer share expenses," or at least some of them, for sales representatives whom Dooney classified as employees. *See* Complaint, ¶ 16. It is worth noting, however, that Moholt offers no factual support for this specific allegation. In his declaration submitted in opposition to Dooney's motion for summary judgment, Moholt says nothing at all about any awareness he may have had

about what expenses Dooney paid or didn't pay for its employees. *See* Decl. of Ron Moholt

(Dkt. 43). Nevertheless, drawing all reasonable inferences in favor of a non-moving party, the

Court will assume that Moholt was generally aware of what Dooney paid for its employees to do

their jobs.

Based on these three premises, Moholt concludes, at step four, that Dooney's "adoption"

of a plan or policy to pay "employer share expenses," of which Moholt was aware, constitutes

"an offer of a unilateral contract to the employee." Complaint, ¶ 17, citing *Rose City Transit Co.*

*v. Portland*, 271 Or. 593, 533 P.2d 339 (1975).

In *Rose City*, the Oregon Supreme Court held that the City's adoption of a pension plan is

an "offer for a unilateral contract" and this plan "may be viewed as an offer to the employee

which may be accepted by the employee's continued employment, and such employment

constitutes the underlying consideration for the promise." *Rose City*, 271 Or. at 592-93

(quotation marks and citation omitted). The Oregon Supreme Court in *Rose City* identified three

elements required for employer liability under a pension plan under this theory:

> For an employer to become liable under a pension plan, it must be
> shown (1) that the employer has adopted a plan to pay retirement
> benefits, (2) the employee knows of the plan, and (3) the employee
> is eligible for benefits under the plan:
>
> "* * * [W]here the employer has a fixed pension plan and the
> employee knows of it *and continues in the employment in the
> honest belief that he will be the recipient of such plan*, the
> employee may enforce his right to a pension * * *."

*Rose City*, 271 Or. at 593 (citation omitted) (alternation in original) (emphasis added).

Moholt appears to argue that Dooney's obligation to its employees to pay the "employer

share expenses" has become one of the terms of Moholt's implied-in-fact contact. If Moholt is

correct, it would follow that because Dooney did not pay for the alleged "employer share

expenses" (or reimburse Moholt for them), Dooney "breached the contractual obligation to pay

employer share expenses for Plaintiff throughout the course of Plaintiff's employment."

Complaint, ¶ 18. There are two independently fatal flaws with Moholt's argument.

### a. Moholt offers no evidence that he held an honest belief that Dooney would pay him for the claimed "employer share expenses"

In *Staley v. Taylor*, 165 Or. App. 256, 994 P.2d 1220 (2000), the Oregon Court of

Appeals explained the concept of an implied-in-fact contract. The court's opinion, written by

then-Court of Appeals Judge Kistler, states:

> An implied-in-fact contract is no different in legal effect from an
> express contract. *Restatement (Second) of Contracts* § 4
> comment a (1979). The only difference between them is the means
> by which the parties manifest their agreement. In an express
> contract, the parties manifest their agreement by their words,
> whether written or spoken. *Id.* In an implied-in-fact contract, the
> parties' agreement is inferred, in whole or in part, from their
> conduct. *Id.*

*Staley*, 165 Or. App. at 262.

Applying this concept in the context of Moholt's theory under *Rose City*, the principle

that results is that: (a) for any employer who has a plan or policy to provide some benefit for all

employees; (b) where an employee is otherwise eligible for that benefit; and (c) where that

employee knows of the employer's plan or policy and continues in the employment in the honest

belief that he or she will be the recipient of that benefit*,* then that benefit becomes a term of the

employment agreement. In fact, the continuation of the employment in the honest belief that the

employee will be the recipient of that benefit must be a condition precedent to the employer's

liability (or a condition that must be satisfied before an obligation will be implied under *Rose*

*City*) because, as we have already seen, an employer is always free to modify the prospective

terms of an "at will" employment relationship. *See Brett*, 130 Or. App. at 57; *Duncan*, 973 F. Supp. at 1177.[9]

Moholt neither alleges nor offers any evidence to show that he ever he held an honest belief that Dooney would pay for or reimburse Moholt for the "employer share expenses." And here any such inference that he did hold such a belief would not be reasonable in light of the evidence, even when viewed in the light most favorable to Moholt. For more than 11 years, Moholt himself paid for the expenses that are at issue, including hiring five independent contractors. He was expressly told by Dooney that Dooney would not reimburse Moholt for the computer that Dooney required Moholt to buy. And Moholt, in more than 11 years working for Dooney, never asked Dooney to pay for any of these expenses (except possibly the computer, and Moholt promptly was told that Dooney would not pay for it). Nor, in more than 11 years, did Moholt ever submit to Dooney any request for reimbursement. Finally, Moholt's own tax returns claimed the benefit of Moholt having paid these expenses himself. These facts demonstrate that, during his relationship with Dooney, Moholt never held the honest belief that Dooney would pay for these "employer share expenses." Thus, it was never part of the contract between Dooney and Moholt, under either a theory of express contract or a theory of contract implied-in-fact, that Dooney would have such an obligation. Accordingly, Dooney did not breach its contract with Moholt by failing to pay the "employer share expenses," and summary judgment in favor of Dooney on Moholt's Third Claim for Relief is appropriate.[10]

---

[9] Dooney, however, would not be permitted to pay the expenses for some employees and deny them for others, even prospectively, based upon an impermissible reason, such as unlawful discrimination, but Moholt does not allege that he was treated differently based upon any unlawful discrimination, retaliation, or discriminatory factor such as race, ethnicity, gender, age, religion, disability, marital status, or sexual orientation or identity.

[10] The Court rejects Dooney's argument that Moholt's claim is barred by the six-year statute of limitations applicable to contract claims in Oregon. If Dooney were contractually

**b.   The distinction between an independent contractor and an employee is not relevant to Moholt's claim alleging breach of contract**

The parties have stipulated that Dooney classified Moholt as an independent contractor, rather than as an employee. Stipulation of Facts, ¶ 1. Step one of Moholt's implied-in-fact contract argument asserts that Dooney misclassified Moholt. As Moholt alleges, he was an "'employee' as a matter of law." Complaint, ¶ 5.

A fundamental issue that can arise in any working relationship is whether a person is an employee or an independent contractor. The correct classification of such a person can have significant consequences for that person, for that person's principal or employer, or both. In addition, where the correct classification matters, what the parties to the work relationship have chosen to call themselves is not the determinative factor. What label the parties to such a relationship have chosen for themselves is a relevant factor, but it is only part of a multi-factor test, and the relevant test differs depending on the reason why such a classification matters. The two tests most often employed are referred to as the "right-to-control" test and the "economic realities" test. Moholt argues that the "economic realities" test should be used; Dooney argues that the Court should employ the "right-to-control test." For purposes of Moholt's Third Claim for Relief (unlike his Second Claim for Relief), neither test is relevant.

One area in which the correct classification matters concerns the potential liability of an employer to a third party under the common law. In general, an employer is not responsible to third parties for the actions of an independent contractor, whether such liability is alleged in tort or in contract. For example, under Oregon tort law, an employee's tortious conduct may create

---

obligated to reimburse Moholt for certain expenses, the fact that Moholt did not seek such reimbursement for an expense incurred ten years ago (which claim would now be time-barred) does not necessarily preclude him from seeking reimbursement for a different expense incurred three years ago (which would not be time-barred). Whether Dooney might have a successful waiver or laches defense, however, is not currently before the Court.

vicarious liability on the part of the employer, but an independent contractor's tortious conduct causing injury to a third party generally will not. *See Schaff*, 334 Or. at 100 (applying the "right to control" test when evaluating whether to impose liability on an employer for harm done to a third party by a putative employee and finding no vicarious liability for the acts of an independent contractor).

A second area in which the correct classification matters concerns an employer's obligation under federal and state statutory law to pay an employee at least a minimum wage, to pay overtime when required, and not to take unauthorized deductions from an employee's paycheck. In *Slayman*, the Ninth Circuit explained the various tests to be applied, based on statutory interpretation, when evaluating these issues under Oregon law. According to the Ninth Circuit in that case, claims for unauthorized paycheck deductions under Or. Rev. Stat. § 652.610 are governed by Oregon's "right-to-control" test, and claims for unpaid overtime wages under Or. Rev. Stat. § 653.261 are governed by Oregon's "economic realities" test. *Slayman*, 765 F.3d at 1042. Similarly, in determining whether a worker is an "employee" to whom Oregon's state minimum wage law applies under Or. Rev. Stat. § 653.025(1), the applicable standard is the "economic realities" test. *See Cejas*, 260 Or. App. at 97-100. The "economic realities" test is also the relevant standard used by federal courts to determine "whether a worker is employed within the meaning of the FLSA [Fair Labor Standards Act]." *Id*. at 95.

The correct classification between an employee and an independent contractor is also significant in other contexts. For example, federal and state employment discrimination statutes may apply to employees differently than they apply to independent contractors. There are also differences in an employer's statutory federal and state income tax withholding obligations, application of federal and state family and medical leave laws, collective bargaining statutes,

unemployment compensation laws, rights of access to personnel records, among others. But Moholt has not alleged as part of his breach of contract claim any claim of statutory violation, including any violations of minimum wage, overtime, or paycheck deduction laws.[11]

Instead, in his Third Claim for Relief, Moholt alleges only that Dooney breached its oral contract. As explained above, Moholt offers no evidence that Dooney ever agreed to pay for or reimburse him for any of these "employer share expenses." Thus, there is no evidence of any breach, which is fatal to Moholt's claim for breach of contract.[12]

---

[11] Moholt has alleged as part of his damages that he paid $25,805 in "self-employment taxes," which he would not have had to pay had he been classified by Dooney as an employee. *See* Stipulation of Facts, Exhibit 1 (Dkt. 33-1). These damages, however, are not sought as part of a statutory violation or right, but simply as part of Moholt's claim of "breach of contract." As explained above, Moholt offers no evidence that Dooney ever contractually agreed to pay for or reimburse Moholt for any "self-employment taxes."

[12] The Court declines at this time to resolve the parties' dispute concerning Dooney's claim for equitable recoupment. Dooney argues that if Moholt were found to have been an employee, rather than an independent contractor, then he was one since 2000. Dooney generally paid Moholt a five percent commission, even though Dooney only paid its sales employees a one percent commission, plus a base salary and other benefits. Dooney argues that the difference of four percent is substantial, especially in Moholt's earlier years. Dooney concedes that any counterclaim for "excess" commissions paid before six years prior to the filing of the Complaint would be time-barred, but Dooney seeks to reduce any damages it may owe to Moholt by the amount of any net "excess" commissions paid during the entire 11-year relationship.

Both setoff and recoupment may be available as defenses for the purpose of reducing a plaintiff's claim. A setoff may be asserted for any claim, even one independent and unconnected with a plaintiff's cause of action, but a setoff is subject to a statute of limitations defense. Recoupment, however, is not subject to a statute of limitations defense, but is "confined to matters arising out of and connected with the transaction upon which the [plaintiff's] action is brought." *Rogue River Mgmt Co. v. Shaw*, 243 Or. 54, 58-59, 411 P.2d 440 (1966). Here, Dooney's claimed recoupment going back to 2000 does not fit cleanly within the category of a matter "arising out of and connected with the transaction upon which the action is brought" because Moholt's claimed transactions only go back to 2007. On the other hand, Dooney's claim also is not entirely "unconnected" to Moholt's theory of his lawsuit.

**CONCLUSION**

Dooney's Motion for Summary Judgment (Dkt. 35) is granted in part and denied in part. Defendant's motion for summary judgment against Plaintiff's "Additional Nordstrom Commissions" claim (Plaintiff's First Claim for Relief, Wage Claim Part One) is granted. Defendant's motion for summary judgment against Plaintiff's "Nordstrom Rack" claim (Plaintiff's First Claim for Relief, Wage Claim Part Two) is granted in part and denied in part as follows: Plaintiff's "Nordstrom Rack" claim may proceed only with regard to Plaintiff's claim for the first month's commission earned in February 2009 relating to shipments made to the Nordstrom Rack. Defendant's motion for summary judgment against Plaintiff's Second Claim for Relief (statutory penalty) is denied. Defendant's motion for summary judgment against Plaintiff's Third Claim for Relief (Breach of Contract) is granted.

**IT IS SO ORDERED**.

DATED this 19th day of November, 2014.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge