**Scott G. Seidman**, OSB No. 833209
  Direct Dial:  503.802.2021
  Fax:  503.972.3721
  E-Mail:  scott.seidman@tonkon.com
**Colin Love-Geiger**, OSB No. 094253
  Direct Dial:  503.802.2091
  Fax:  503.972.3791
  E-Mail:  colin.love-geiger@tonkon.com
**TONKON TORP LLP**
1600 Pioneer Tower
888 S.W. Fifth Avenue
Portland, OR  97204

**Thomas J. McAndrew,** RISB No. 1001, *Pro Hac Vice*
  Direct Dial:  401.455.0350
  Fax:  401.455.0882 Fax
  Email:  tmcandrew@tjmcandrewlaw.com
**THOMAS J. MCANDREW & ASSOCIATES**
One Turks Head Place, Suite 205
Providence, Rhode Island 02903

        Attorneys for Defendant Dooney & Bourke, Inc.

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(Portland Division)

RON MOHOLT, an individual

                Plaintiff,                              **Civil No. 3:13-cv-01026-SI**

        v.                                              **DEFENDANT'S TRIAL
                                                          MEMORANDUM**

DOONEY & BOURKE, INC., a Connecticut
corporation,

                Defendant.

## I. INTRODUCTION

After claiming $458,263.08 in his Complaint, the only issue left in this case is whether or not Plaintiff Ron Moholt is entitled to attorney fees and penalty wages in connection with his claim for $2,147.60 commissions on sales to Nordstrom Rack for the month of February 2009. Although Dooney & Bourke contends that no commission was due, the commission itself is no longer an issue because Dooney & Bourke has tendered to Plaintiff $2,153.34 which is $2,147.60 plus interest.

Plaintiff is not entitled to penalty wages or attorney fees for three reasons. First, Plaintiff was an independent contractor, not an employee, so the statute providing for attorney fees and penalty wages does not apply. Second, if the court finds that Plaintiff was an employee, the doctrine of equitable recoupment eviscerates any damages, leaving no wages due. Without any wages due, the penalty wage and attorney fee claims must fail. Finally, even if the court disagrees with the above analysis, no wages were due because it was never contemplated that Plaintiff would receive commissions for Dooney & Bourke's sales to Nordstrom Rack. Plaintiff is also not entitled to penalty wages because his November 1, 2012 demand for unpaid wages in the amount of $692,411.10 was not reasonable in relation to the actual amount the court found Dooney could possibly owe - $2,147.60.

## II. SUMMARY OF FACTS

Defendant Dooney & Bourke, Inc. ("Dooney & Bourke" or "Dooney") is a manufacturer and wholesale distributor of fashion handbags and accessories with its corporate headquarters in Norwalk, Connecticut. Dooney & Bourke sells its products to large national and regional department store chains, such as Macy's, Nordstrom, and Dillards, as well as individual retailers, such as dress shops and golf pro shops. Dooney makes most of its sales through individuals it classifies as independent sales representatives. Over the years, Dooney has assigned

responsibility for some retail accounts to employees stationed in Norwalk.  With one exception,[1] the employees who performed sales functions continued to perform other, non-sales functions for Dooney.  Dooney employees who performed sales functions were paid a base salary and generally a 1% commission[2] on net shipments to their accounts.  Plaintiff Ron Moholt worked with Dooney as an independent contractor selling its handbags.  He was compensated solely on a commission basis.

A.     **Plaintiff controlled how he performed his work**

Plaintiff Ronald Moholt ("Moholt"), at all times during the January 1, 2007-March 15, 2012 period alleged in this case, resided in Portland, Oregon.  Before joining Dooney, Moholt was an employee for Hanes Hosiery for which he sold products to accounts such as Meier & Frank.  As a Hanes employee, Moholt received a base salary plus commissions, as well as numerous employee benefits, such as paid vacation and health care and retirement plan participation.  In late 2000, Moholt contacted Dooney to inquire about an opportunity and was interviewed by Dooney's then Vice President of Sales, Tom Bendheim ("Bendheim").  In or about November 2000, Bendheim offered to Moholt and Moholt accepted an opportunity working as Dooney & Bourke's independent sales representative for the Pacific Northwest, which the parties agreed and intended as an independent contractor position.

Moholt serviced Dooney & Bourke accounts in Oregon, Washington, Idaho, Montana, and Hawaii.  Moholt remained in that position until Dooney ended the contract on or about March 15, 2012.  At the time of the offer, Bendheim explained to Moholt that, as with all of Dooney's other independent sales representatives, Moholt was responsible for all of his own

---

[1] The one exception was an employee named Lyn Andrus, who, after performing sales and non-sales functions for several years, became solely a sales employee when she moved to Maryland to get married sometime in the mid-2000s.

[2] Employees were sometimes paid less than 1%, but those instances are immaterial for purposes of this case.

expenses and benefits as part of the parties' agreement.  At all times during his Dooney tenure, Moholt supplied his own car, which he used to visit customers in his territory;  paid for all of his travel expenses, such as airfare, lodging and meals; had a home office in Oregon from which he worked; supplied all of his own equipment, including a computer that Dooney acquired, loaded with software that allowed Moholt to interface with Doney's computers, and charged Moholt for; and communicated with Dooney & Bourke and his customers through internet and cell phone accounts that he paid for.  The only expenses incurred by Dooney were a voicemail and an email address that Dooney created to allow customers to leave messages for Moholt when he was traveling, and certain promotional materials that Dooney created for each fashion season describing the products.  Moholt provided his own benefits such as health insurance and scheduled his own vacations for which he received no payment from Dooney & Bourke. Moholt's investment in the costs of doing business as a sales representative dwarfed any costs invested by Dooney & Bourke.

Every year that Moholt was a Dooney & Bourke sales representative, he filed tax returns as a sole proprietor on Schedule C.  He offset all of his expenses directly against his earnings rather than as an itemized deduction for unreimbursed business expenses on Schedule A, which would have limited his deduction to amounts over 2% of his earnings.  Moholt's accountant, Donald Smith, had no question that Moholt was an independent contractor for tax purposes.  He never considered providing notice with the IRS that filing as a sole proprietor was a questionable position, nor did he ever consider filing a request with the IRS to make an independent classification of whether Moholt was an employee or an independent contractor.  Smith has never counseled Moholt to file an amended tax return, nor has Moholt done so.  At all times, Dooney & Bourke paid Moholt solely on a commission basis.

Moholt earned most of his commissions on sales to the three large customers that had stores (known as "doors") in his territory, Nordstrom, Bon Marche, and Robinsons-May, for which he generally received a 5% commission on net shipments. For 2005-2006, Moholt received a 2% commission on sales to Meier & Frank (then owned by Robinsons-May). Moholt received a 3.5% commission on the smaller dress shop accounts in his territory. During the period January 1, 2007-March 15, 2012, Moholt earned commissions at 5% and at 3.5%, depending on the account.

Moholt's duties as a Dooney & Bourke sales representative consisted of showing the collections to the buyers in his territory; obtaining commitments from those buyers on styles, volumes, and delivery schedules; negotiating to extend delivery when the product could not be shipped in the original window; monitoring inventory at doors and obtaining re-orders; and providing any follow up services the customers required. During his entire Dooney tenure, Moholt controlled the physical performance of these duties. He controlled when he worked; the number of hours he worked; where he worked, which was mostly from his home office; what to wear, which included dressing in skivvies or pajamas and a bathrobe when starting his day in his home office; which customers to visit and when; and how many merchandisers to engage as his own independent contractors to help him perform his duties such as visiting the doors in his territory to monitor inventory and set up displays. Dooney & Bourke set no hour requirements or sales quotas for Moholt. Nor did Dooney monitor Moholt's performance. Dooney conducted no performance reviews, did not provide any sales pitches, and had no supervisor who accompanied Moholt on any sales calls to rate his performance.

Between four and five times a year during Moholt's Dooney tenure, the fashion handbag industry held "Market Week" in New York City in which Dooney & Bourke participated.

Market Week is an industry-wide activity at scheduled times of the year when buyers at Macy's, Nordstrom, Dillards, and the like flock to New York for presentations by Dooney & Bourke and Dooney's competitors, such as Coach and Michael Kors. On Monday of a given Market Week, Dooney would show the new handbag collections to its sales representatives at its corporate headquarters in Norwalk, Connecticut. The sales representatives would then show the collections to the buyers from their respective territories on Tuesday through Thursday at rented space in New York (such as the Javitz Convention Center). Although Moholt contends that Dooney required him to attend Market Week, there was no such requirement. The sales representatives had every incentive to attend Market Week without Dooney & Bourke instituting any requirement, as failing to attend would cede the field to the representatives of Coach and Michael Kors.

At all times during Moholt's tenure, Dooney & Bourke controlled who its customers were; the wholesale prices charged to its customers; any margin guarantees provided to its customers; any price reductions provided to customers for slow moving products; any returns customers were authorized to make; and all other ways that customers received credit on their purchases. Credits provided to customers generally resulted in charge backs to the sales representative's commissions, including Moholt. Dooney also controlled the allocation of charge backs when it approved a credit to a customer that was shared by more than one sales representative, such as Nordstrom, which was shared by Moholt, Lyn Andrus, and William Tripodi, another independent sales representative. None of these actions amounted to control by Dooney & Bourke over Moholt's physical performance of his duties, but rather relate to the manner he was compensated. Moholt was not retained to set wholesale prices any more than he was retained to design handbags. Nor did Moholt have customers; he did not buy merchandise

from Dooney & Bourke and then resell it. Rather, he serviced Dooney accounts that had doors in his territory.

At all times during his Dooney tenure, Moholt was free to represent other products, so long as they did not compete with Dooney & Bourke. Indeed, early in his tenure, Moholt represented a hosiery line. Although Moholt ceased that hosiery line representation two years into his Dooney tenure and did not represent any other lines, this was not a result of anything done by Dooney & Bourke but instead resulted from Moholt's own choice or market forces that Dooney & Bourke did not control. Dooney & Bourke did not exercise any significant control over Moholt's physical performance of the duties he was retained to perform. Rather, Moholt was retained to produce a result – sales to the accounts in his territory. This is particularly illustrated by Moholt's use of merchandisers to service his accounts. Moholt was free to visit as many doors in his territory as he wanted or to retain merchandisers to make these visits. The number of merchandisers Moholt used ranged from two to five and varied almost every year involved in this case.

Towards the end of his Dooney tenure, Moholt was down to so few doors that he did not use merchandisers to visit his own doors. Instead, he effectively leased his merchandisers to service the Macy's doors that were the account of another sales representative, Jeff Mazzarro. Moholt paid his merchandisers, and Mazzarro reimbursed Moholt for the entire cost plus $5 per hour for Moholt's merchandisers that visited Mazzarro's doors.

B. **Nordstrom Rack**

Plaintiff serviced Nordstrom Rack, and was compensated for his service, as part of his commissions on sales to Nordstrom. Nordstrom Rack is the discount arm of Nordstrom. Nordstrom, one of Plaintiff's largest and most lucrative accounts, pressured Dooney & Bourke for a number of years to supply the Rack. Dooney & Bourke resisted because this was not a

good business strategy for the company. Nordstrom Rack demanded margin guarantees from its suppliers, which meant that Dooney would have to sell its products at lower prices to the Rack, leaving little margin for the company (let alone for commissions). Dooney had its own outlet stores through which it could sell the same bags directly to retail customers at better margins. But due to Nordstrom's importance as a customer, Dooney & Bourke eventually gave in to Nordstrom's pressure and began selling to the Rack in 2009. Nordstrom was an important customer for both Dooney and Plaintiff, because it was a recognized market leader and because it sold a large volume of Dooney products.

The Rack initially became a house account assigned to Dooney's National Sales Representative Mairead Ainley, who received no commissions on Rack sales. This is significant because it shows that even if Plaintiff had been an employee, he would not have received commissions for assisting with Nordstrom Rack. Ainley asked Moholt, Bill Tripodi, and Lynn Andrus to provide some support help with the Rack stores in their territories. The support did not require any sort of active selling in the way retail accounts did – rather the support provided was limited to making sure that orders were delivered on time and managing other logistical issues. Moholt provided support for three selling seasons spanning over spring 2009 to fall 2010.

When Mairead Ainley contacted Plaintiff about providing support for sales to Nordstrom, they never discussed that Plaintiff would receive any sort of separate compensation for the support. Rather, it was mutually understood that the joint effort was for the joint benefit of Dooney & Bourke and Plaintiff because it helped to keep a good relationship with lucrative customer Nordstrom. Plaintiff did not ask if he would be a paid a commission for his assistance, nor did Ainley tell him that he would be paid. Dooney & Bourke followed a well-known policy of not paying commissions on sales to discounters. During Moholt's tenure, Dooney & Bourke sold to discounters Marshalls, T.J. Maxx and Stein Mart in addition to the Rack, but no one received commissions on these sales, with only one exception.

C.    **Plaintiff's deficient wage demand letter**

On November 1, 2012, Plaintiff sent Dooney & Bourke a letter with the subject heading, "Notice of Claim for Wages." The letter informed Dooney & Bourke that it allegedly owed Plaintiff $212,954.40 in commissions for Nordstrom, $33,130.68 for commissions for Nordstrom Rack, and $446,326.00 for expense reimbursements and employer-share taxes. The letter did not contain information sufficient to give Dooney notice that there had been a misunderstanding and that during Plaintiff's first month of servicing Nordstrom Rack, he was under the impression that he would receive commissions for the account. Rather the letter, which quoted Phil Kinsley as saying, "We don't pay commissions on discounters," took the tone of retroactively demanding different terms than the terms under which the parties had operated for years without complaint.

## III.    ARGUMENT

A.    **Plaintiff Ron Moholt is the classic independent contractor**

Plaintiff is the classic example of the outside sales representative independent contractor recognized under Oregon case law. He worked out of his house, often in his bathrobe. He determined his own hours and how he would spend each day. He sold merchandise for another company besides Dooney & Bourke. He employed and issued tax documents to his own display merchandisers. He decided when and if to visit clients. In short, under the relevant test, Plaintiff was an independent contractor as a matter of law.

The common law test for employment status in Oregon is the "'right to control' test, *i.e.,* whether the employer had the right to control the manner in which [the worker] performed services." *Grove City Veterinary Serv., LLC v. Charter Practices Int'l LLC*, 3:13-CV-02276-AC, 2014 WL 3371918 (D. Or. July 9, 2014) (citing *Schaff v. Ray's Land & Sea Food,* 334 Or. 94, 99 (2002).). "The principal factors under that test are (1) the right to, or the exercise of, control; (2) the method of payment; (3) the furnishing of equipment; and (4) the right to fire." *Perri v. Certified Languages Int'l, LLC,* 187 Or. App. 76, 82, 66 P.3d 531 (2003) (citing *Castle*

*Homes, Inc. v. Whaite,* 95 Or. App. 269, 272, 769 P.2d 215 (1989)). "Direct evidence of the right to control is the most important factor under Oregon law." *Slayman v. FedEx Ground Package Sys., Inc.,* 12-35525, 2014 WL 4211422 at*6 (9th Cir. Aug. 27, 2014) (citing *Great Am. Ins. Co. v. Gen. Ins. Co. of Am.,* 257 Or. 62, 475 P.2d 415, 418 (1970).).

In *Avanti Press, Inc. v. Employment Dept. Tax Section*, the Oregon Court of Appeals considered whether a sales representative was an independent contractor or an employee in circumstances very similar to Moholt's claim here. 248 Or. App. 450, 274 P.3d 190 (2012). In that case the sales representative sold greeting cards for a greeting cards manufacturer, which set product prices and sales goals. *Id.* at 454. The sales representative set her own schedule and decided how frequently to visit customers. *Id.* The sales representative was paid entirely in commissions for sales, and the manufacturer offset the commission payments to account for "unspecified customer deductions, returned products, and settlements with late-paying customers[.]" *Id.* at 470. She maintained and worked out of a home office she furnished with equipment that she deducted as office-related business expenses from her personal income tax return. *Id.* at 454. She used her personal vehicle for business travel, and the manufacturer did not reimburse travel expenses. *Id.* She passed out business cards that made it seem as if she worked for the manufacturer, used manufacturer promotional materials, and during the relevant time period she represented only the manufacturer, which was her sole source of income. *Id.* at 454-55.

In analyzing the sales representative's employment status, the Oregon Court of Appeals focused first and primarily on the right to control factor, finding that she "controlled when and how often she worked," and that "in practice [she] could decide how frequently to visit customers." *Id.* at 466-67. The court held that the manufacturer's right to control product prices, products, and any other terms or conditions of sale did not demonstrate any sort of control, holding rather that these issues were never part of the sales representatives' services and were evidence of an independent contractor relationship. *Id.* at 470-71. Likewise, the court held that

the manufacturer's ability to offset commission payments and determine the timing of payments were not evidence of control, but rather were part of the commission payment system under which sales were completely dependent on the sales rep's efforts. *Id.* at 470. Finally, the court examined the sales rep's investment in the equipment used, and held that her provision of her own office equipment and vehicle weighed in favor of an independent contractor relationship. *Id.* at 471. The court noted that the manufacturer's provision of promotional materials was simply part of its right to specify the desired results. *Id.* After evaluating all relevant facts, the *Avanti* court held that the sales representative was properly classified as an independent contractor, not an employee. *Id.* at 473.

Similarly, in *Matter of Compensation of Henn*, 60 Or. App. 587, 654 P.2d 1129 (1982), the court considered whether a door-to-door magazine sales representative was an independent contractor or employee through the right to control test. The court noted that the magazine company encouraged, but did not require, the sales representative to work eight hours per day. *Id.* at 589. The company also required the sales representative to call in and report on sales daily, but the sales representative did not always do so. *Id.* at 591. The company provided training to the sales representative, provided promotional materials, and required the representative to memorize a sales pitch. *Id.* at 589-90. A supervisor from the magazine accompanied the sales representative on her first three days of work. *Id.* at 590. The sales representative visited the magazine company worksite occasionally to obtain additional promotional materials and the magazine sometimes provided the sales representative with sales leads. *Id.* at 591. The sales representative determined her own work schedule, drove to see potential customers in her own car, and was paid entirely on a commission basis. *Id.* at 590-91. She displayed promotional materials in a photo album she purchased, used her own sales techniques, and had discretion about which customers to visit. *Id.* at 591-92. Finally, the sales representative was allowed to sell products for other companies, although she chose to work exclusively for the magazine. *Id.* at 591. Applying the right to control factors, the court held

that there was little evidence of control, and cited the sales representative's discretion as to how, when, and where she did her job. *Id.* at 591-92. Addressing the company's prerogative to end the relationship, the court held,

> An unqualified right to fire, indicative of an employer-employee relationship, must be distinguished from the right to terminate the contract of an independent contractor for bona fide reasons of dissatisfaction. The exercise of such a right is still consistent with the idea that a satisfactory end result is all that is aimed for by the contract.

*Id.* at 592-93. After applying the right to control test, the *Henn* court held that the sales representative was an independent contractor as a matter of law.

A similar factual scenario, analysis, and result played out in *Jenkins v. AAA Heating & Cooling, Inc.*, 245 Or. 382, 421 P.2d 971 (1966). In that case the Oregon Supreme Court was called upon to determine whether a furnace salesman for a heating company was an independent contractor under common law. *Id.* at 383-84. The salesman could sell furnaces either by going door-to-door or using the telephone. *Id.* at 384. He determined his own hours and made as many or as few calls as he saw fit, although he had sales goals. *Id.* at 385-86. He was paid solely on a commission basis, but received no payment for orders that were canceled by the customer or rejected by the company. *Id.* at 384. For tax purposes, unemployment compensation, social security, and the like, the company made no withholdings, and the salesman determined how to withhold for the various government agencies. *Id.* at 385. The company's practice was to terminate its relationship with a salesperson who was unsatisfactory, at any time, and for any reason. *Id.* The salespeople were free to sell for other companies so long as they were not direct competitors. *Id.* In analyzing the employment status of the salesman, the court applied the right to control test. *Id.* at 386. The court agreed that the above facts indicated a "total absence of control exercised by the company over the manner in which the salesmen accomplished their work." *Id.* at 385. On that basis, the *Jenkins* court held that there was no issue of fact that the salesman was an independent contractor. *Id.* at 387.

The above cases, and the details of Ron Moholt's discretion in operating his sole proprietorship, lie in stark contrast to *Slayman v. FedEx Ground Package System, Inc.*, in which the Ninth Circuit Court of Appeals recently held that delivery drivers were employees as a matter of law.  12-35525, 2014 WL 4211422 (9th Cir. Aug. 27, 2014).  In *Slayman*, a class of former FedEx drivers in Oregon brought, *inter alia*, state law wage claims under chapter 652, claiming that although they were paid as independent contractors, they should have been paid as employees.  *Id.*  The court began its analysis by noting that the claims under chapter 652 "are governed by Oregon's right-to-control test."  *Id.* at *6.  (citing *Cejas Commercial Interiors, Inc. v. Torres–Lizama,* 260 Or. App. 87, 316 P.3d 389, 396 (Or.Ct.App.2013).).  In analyzing the first and most important factor – the right to control – the court noted that FedEx controlled driver schedules by structuring workloads so that drivers had to work 9.5 to 11 hours per day, could not leave the terminal in the morning until all packages were ready, and needed to return to the terminals no later than a specified time.  *Id.*  In addition, FedEx controlled aspects of how and when the drivers delivered each package by determining what packages would be delivered by whom and when, negotiating delivery times directly with consumers and dictating it to the drivers.  *Id.*  Finally, FedEx controlled the drivers' appearance every day, dictating details about hats, shoes, and socks, and requiring the drivers to be clean shaven with neat, trimmed hair.  *Id.*  FedEx had further requirements about the drivers' trucks which effectively ensured that the independently owned vehicles looked exactly the same as one another and had internal shelves built to exactly the same specifications.  *Id.*  Primarily on the basis of the above facts, the court held that that FedEx's extensive control over the day-to-day work performed by the drivers made them employees as a matter of law.  *Id*. at *8.

Although there are necessarily many facts relating to the 11-year relationship between Moholt and Dooney & Bourke, there are really only a few that matter for the right to control analysis.  When the facts of Moholt's relationship with Dooney are considered in light of

the facts that make a difference to Oregon courts, no finder of fact could conclude anything other than that Moholt was an independent contractor.

1. **Right to control**

Moholt exercised complete control over the manner in which he carried out his sales work. He set his own hours. He worked out of his home office and determined what to wear, which according to him was a bathrobe and pajamas on a typical work morning. He determined when and how frequently to contact customers. He determined whether to phone, email, or visit customers in person. He hired his own merchandisers. He was allowed to, and did, represent other product lines for other companies.

The facts that Plaintiff argues indicate control are red herrings. According to Plaintiff, Dooney's method of deducting from Moholt's commissions for returned merchandise indicates the company's control – but under *Avanti* this fact properly bears on the method of payment factor. Likewise, Plaintiff argues that by setting the price of its products, Dooney was controlling the manner in which he did his job. Again, under *Avanti*, this fact shows that Moholt was never engaged to set prices – he was engaged to make sales – and the fact weighs in favor of an independent contractor relationship. Similarly, Moholt argues that Dooney's authority to approve or deny which retailers were allowed to sell its product indicates control. But the truth is that any manufacturer of luxury goods necessarily must carefully choose its retailers because they are integral to the image of the brand. Finally, in Moholt's eyes, the fact that Peter Dooney once told the sales representatives their attire should be "crisp and clean" and "white and black" for Market Week is another indicator of control. Not only is this heavily outweighed by the more than 90% of the year when Moholt determined to work in his pajamas, but it also left plenty of discretion to Moholt and, as Moholt frankly admitted in his deposition, had no real effect on him because he always dressed professionally without having to be told. There should be little debate that the facts of the relationship indicate that the right to control factor weighs in favor of an independent contractor relationship.

2.      **Method of payment**

Moholt was paid like a classic independent contractor.  He was paid solely on a commission basis.  The adjustments that Dooney and Bourke made to his commission payments to account for merchandise returns, canceled orders, etc., like in *Avanti* and *Jenkins*, were part of the commission payment system under which sales were completely dependent on Moholt's efforts and which weigh in favor or independent contractor status.  The fact that Dooney made no withholdings from its payments to Moholt, and that Moholt filed his taxes as a sole proprietorship and paid employer side social security taxes and TriMet taxes,[3] indicates that both parties considered Moholt to be an independent contractor during his tenure working with Dooney & Bourke.  While the parties' subjective beliefs are not alone dispositive of this issue, they weigh in favor of independent contractor status.  Likewise, Moholt's accountant testified that he was crystal clear that Moholt was a true independent contractor because he paid for all of his own business expenses, hired his own merchandisers, issued them 1099s, and was issued a 1099 by Dooney.  The fact that Moholt hired merchandisers is one of the strongest indicators that he was an independent contractor, as employees do not hire their own subcontractors to perform their jobs.  Moreover, Moholt made money on his merchandisers when other independent sales representatives paid Moholt to use them to perform merchandising work for accounts they had in his territory.

3.      **Furnishing equipment**

Moholt provided virtually all of his own equipment for his work as a sales representative.  He paid for and used his own phones and computer equipment to communicate with clients.  He provided his own internet service and phone service for his home office.  He paid for and used his own vehicle when visiting customers.  He purchased gifts for clients.  He bought all of his own office supplies.  In short, he furnished pretty much all of the equipment necessary.

---

[3] TriMet taxes are payroll taxes paid only by employers and the self-employed.

Moholt argues that Dooney's provision of a voicemail account and email address weighs in favor of employee status. But these accounts, provided only for the convenience of customers, and accessed only through Moholt's own phone and computer, probably do not qualify as equipment. Moreover, their cost is negligible compared to the thousands of dollars Moholt spent on his own equipment. Put another way, the volume and importance of the equipment provided by Dooney & Bourke pales in comparison with the equipment paid for and provided by Moholt, which tips the scales in favor of an independent contractor relationship.

4. **Right to fire**

There is no dispute that either Moholt or Dooney & Bourke could have severed the sales relationship for reasons relating to the performance of the contract at any time, which is what occurred in 2012 when Moholt's sales had reached an all-time low. But as the court in *Henn* pointed out, this is consistent with the idea that a satisfactory end result – good sales – was all that was aimed for by the contract. This factor is likely neutral in this analysis.

Collectively, the facts above weigh so heavily in favor of independent status that a reasonable person could draw no other inference. Every factor that made the salespersons in *Avanti*, *Jenkins*, and *Henn*, independent contractors as a matter of law is present with Moholt and more. None of them hired their own independent contractors, as Moholt did. Certainly, none of them made money loaning out their independent contractors, as Moholt did. None of them worked in their pajamas and bathrobe. None of them paid TriMet taxes, a tax no employee pays. Accordingly, the court should rule that Ron Moholt was an independent contractor as a matter of law.

B. **Even if Plaintiff were an employee, equitable recoupment eliminates damages**

Moholt's Nordstrom Rack claim – for one month of commission, or $2,147.60 – is eviscerated by the doctrine of equitable recoupment. Under the affirmative defense, Dooney is entitled to subtract any amounts it overpaid to Plaintiff from any amount he claims is left owing. Plaintiff claims he should have been classified as an employee, rather than an independent

contractor.  If Plaintiff had been characterized as an employee, he would have been paid like an employee.  Dooney's employees who performed sales were paid a 1% commission on sales, plus a base salary.  The highest base salary Plaintiff could have obtained would have been $57,500 per year.  Independent contractors who performed sales got between 3.5% and 5% commission on sales, with no base salary.  In this circumstances Plaintiff's Nordstrom Rack claim is subject to Dooney & Bourke's defense that it is entitled to recoup from Moholt the overpayments in commissions it made to him during the entire period of his work with the company.  Even if the recoupment defense is limited to the limitations period, however, Plaintiff is still deep in the red after his commissions are reduced to the 1% rate, plus base salary, that he would have received as an employee.

"Recoupment means the 'cutting back' of the plaintiff's claim by the defendant." *Welsh v. Case*, 180 Or. App. 370, 376, 43 P.3d 445, 449 (2002); *see also Stanley Contracting, Inc. v. City of Carlton*, 03-796-KI, 2006 WL 2045470 (D. Or. July 17, 2006) ("Recoupment is an equitable remedy that reduces, mitigates, or abates damages alleged by the plaintiff.").  Put another way, "recoupment seeks the reduction of a claim because of an offsetting claim arising out of exactly the same transaction."  *Jewell v. Compton*, 277 Or. 93, 97, 559 P.2d 874, 876 (1977) (citations omitted).  Recoupment "allows the court to examine the transaction as a whole[.]"  *Welsh*, 180 Or. App. at 376.  The equitable recoupment defense is distinct from a setoff affirmative defense and is not subject to any statute of limitations.  As the Oregon Supreme Court explained in *Jewell v. Compton*,

> Recoupment is confined to matters arising out of and connected with the transaction upon which the action is brought.

> Set-off is not synonymous with recoupment only in that it is a 'money demand by the defendant against the plaintiff arising upon contract and constituting a debt Independent of and unconnected with the cause of action set forth in the complaint.

277 Or. 93, 95-96, 559 P.2d 874, 875 (1977). For this reason, the affirmative defense of set off is subject to a statute of limitations whereas the affirmative defense of recoupment is not. Id. at 96.

In *Jewell*, the defendants asserted an affirmative defense for money owed by the plaintiff for services rendered by the defendants which were unrelated to the services and debt on which plaintiff sued the defendants. *Id.* at 95. The plaintiffs argued the defense was in the nature of setoff and was barred by the statute of limitations, while the defendants argued the defense was in the nature of recoupment and not subject to any statute of limitations. *Id.* at 96. The court held that the debt owed by plaintiff to defendants was unrelated to the debt on which plaintiff sued, and thus the defense sounded in setoff and was barred by the statute of limitations. *Id.* at 97. Addressing the difference between the two defenses, the court "found no Oregon case holding that the statute of limitations does not apply to a claim of setoff, as distinct from recoupment." *Id.* at 96.

Based on Oregon law, Dooney & Bourke is allowed to reduce what Moholt would have had in commissions from 2000 to 2012 to reduce dollar-for-dollar any recovery Moholt seeks.

| Year | Moholt earnings | Earnings if commission had been at 1% employee rate (earnings divided by 3.5% commission rate) | Imputed highest possible salary for limitations period | Reduction in what Plaintiff would have earned as an employee |
|---|---|---|---|---|
| 2000 | $5,135.80 | $1,467.37 | $4,791.67 | -$1,123.24 |
| 2001 | $70,171.48 | $20,048.99 | $57,500.00 | -$7,377.51 |
| 2002 | $76,660.35 | $21,902.96 | $57,500.00 | -$2,742.61 |
| 2003 | $125,492.62 | $35,855.03 | $57,500.00 | $32,137.59 |
| 2004 | $293,827.76 | $83,950.79 | $57,500.00 | $152,376.97 |
| 2005 | $220,374.74 | $62,964.21 | $57,500.00 | $99,910.53 |
| 2006 | $337,664.75 | $96,475.64 | $57,500.00 | $183,689.11 |
| 2007 | $217,683.36 | $62,195.25 | $57,500.00 | $97,988.11 |
| 2008 | $125,207.71 | $35,773.63 | $57,500.00 | $31,934.08 |
| 2009 | $89,137.43 | $25,467.84 | $57,500.00 | $6,169.59 |
| 2010 | $32,368.79 | $9,248.23 | $57,500.00 | -$34,379.44 |
| 2011 | $62,368.99 | $17,819.71 | $57,500.00 | -$12,950.72 |
| 2012 | $41,571.27 | $11,877.51 | $14,375.00 | $15,318.76 |

| Totals | $1,697,665.05 | $485,047.16 | $651,666.67 | **$560,951.23** |

Applying the recoupment defense, Plaintiff's total earnings would have been reduced by $560,951.23 if he had been classified as an employee. When that amount is subtracted from the $2,147.60 that Dooney could owe Plaintiff, clearly he has no unpaid wages. Without any unpaid wages, Plaintiff is not entitled to attorney fees or penalty wages, as discussed below. This whole lawsuit was an example of Plaintiff wanting to have his cake and eat it too. Plaintiff is not entitled to the remedies he seeks because at the end of his relationship with Dooney, nothing was left owing.

C.     **Plaintiff is not entitled to penalty wages because his demand was unreasonable in relation to the wages possibly owing and because the failure to pay was not willful**

Even if Dooney & Bourke is found to be Plaintiff's employer, it is still not liable for any penalty wages because Plaintiff's 12-day demand letter did not provide a reasonable estimation of the wages due or sufficient information for Dooney to conclude that it owed Plaintiff wages. In addition, Dooney is not liable because it did not willfully fail to pay plaintiff. Alternatively, the penalty should be capped at 100 percent of the unpaid wages, or $2,17.60.

1.     **No penalty wages**

Under ORS 652.150, "if an employer *willfully* fails to pay any wages or compensation of any employee whose employment ceases . . . then, as a penalty for the nonpayment, the wages or compensation of the employee shall continue," but "[i]n no case shall the penalty wages or compensation continue for more than 30 days from the due date." ORS 652.150(1)(a) (emphasis added). The Oregon Supreme Court has held,

> ORS 652.150 authorizes the imposition of a penalty only if the employer Wilfully fails to pay his employee's wages. An employer acts wilfully if, having the financial ability to pay wages *which he knows he owes,* fails to pay them. The statute was not intended to impose liability where the employer's refusal to pay wages is based upon a bona fide belief that he is not obligated to pay them.

*Hekker v. Sabre Const. Co.,* 265 Or. 552, 561, 510 P.2d 347, 351 (1973). The burden to prove

willful conduct on the part of the employer, under ORS 652.150(1), is on the plaintiff.  *Id.*, *see also Sabin v. Willamette–Western Corp.*, 276 Or. 1083, 1093, 557 P.2d 1344 (1976).  Section 2 of the statute explains that to be entitled to a penalty, plaintiff must also give defendants a sufficient written notice:

> (2)(b) If the employee or a person on behalf of the employee fails to submit a written notice of nonpayment, the penalty may not exceed 100 percent of the employee's unpaid wages or compensation.
>
> (c) A written notice of nonpayment must include the estimated amount of wages or compensation alleged to be owed or an allegation of facts sufficient to estimate the amount owed.  Submission of a written notice of nonpayment that fails to include the estimated amount of wages or compensation alleged to be owed or an allegation of facts sufficient to estimate the amount owed does not satisfy the requirement for written notice under this subsection unless the employer has violated ORS 652.610, 652.640 or 653.045.

ORS 652.150(2)(b)-(c).

Here, Plaintiff's November 1, 2012 notice of wage claim letter was not sufficiently specific to allow Dooney & Bourke to determine that it owed Mr. Moholt $2,147.60 in unpaid commissions.  The letter claimed $212,954.40 for commissions to Nordstrom, $33,130.68 for commissions to Nordstrom Rack, and $446,326.00 in expense reimbursements, for a total of $692,411.08.  This court has held that there is a question of fact only as to whether Dooney owed Plaintiff $2,147.60, or 0.3% of the total claimed in the letter.  In the short section of the letter that addresses solely Nordstrom Rack, Plaintiff first points out evidence that any failure to pay was not willful by quoting Phil Kinsley as saying, "We don't pay commissions on discounters."  Then the letter says $33,130.68 is owing and refers to an Exhibit 2, a spreadsheet created by the Plaintiff with calculations at a 2.5% commission rate written into it – a rate no one promised him and which was never paid to him for sales to any discounter.  Under these circumstances, it would not be reasonable to expect Dooney & Bourke to be able to figure out that it owed Plaintiff one month of commission – despite never promising to pay it – from back in February 2009.  Plaintiff's notice of wage claim was simply insufficient to alert Defendant that certain

wages were due. Because the notice was insufficient, wildly inaccurate, and because Dooney & Bourke and Phil Kinsley firmly believed that no wages were left due, penalty wages should not be awarded here. To the extent the court disagrees, the penalty should at least be limited to 100% of the amount owed.

       2.     **Plaintiff is not entitled to attorney fees because no wages were due**

Pursuant to ORS 652.200, Plaintiff is entitled to an award of attorney fees in connection with his wage claim only if he obtains a judgment for wages due. Plaintiff is not entitled to an attorney fee award, first and foremost, because he was an independent contractor, and thus any money possibly owed does not qualify as wages. Second, even if he was an employee, he does not get attorney fees because no wages were due because of the doctrine of equitable recoupment. Third, even if he were an employee, no wages, and therefore no attorney fees, were due because the parties never contemplated separate payments for supporting the sales to Nordstrom Rack.

       D.     **The parties never contemplated payment for servicing Nordstrom Rack**

Oregon does not have any law expressly governing how manufacturers are required to compensate independent sales representatives. There is thus no applicable law that would force Dooney & Bourke to pay commissions to Moholt on every sale (even if we assume that what Moholt did for Nordstrom Rack could be called making a "sale"). Even if Moholt should have been classified as an employee, nothing in Oregon or federal wage and hour law requires an employer to pay a commission on every sale. The Fair Labor Standards Act and ORS § 653.020(6) exclude outside salespeople from minimum wage and overtime laws, requiring only that the employee's primary duty be making sales and that the employee be customarily engaged away from the employer's place of business. *See* 29 U.S.C. § 213(a)(1) and 29 C.F.R. Part 541.500; OAR 839-020-0005. These laws impose no requirement on how commissions are paid or on the amount of commissions. There are no facts indicating that there was ever an agreement to pay commissions to Plaintiff for servicing Nordstrom Rack. Plaintiff

has not identified any communication, oral or written, in which he was told that he would be paid for helping to process Nordstrom Rack orders. Nor has he identified a communication in which he addressed the practice of not paying Nordstrom Rack commissions.

The problem for plaintiff is that, under Oregon law, the course of performance provides the contract terms. Put another way, to determine the parties' contractual intent, courts look to evidence of the parties' actions, behavior, and statements (before any dispute arose) as a "practical construction" of their agreement. *Yogman v. Parrott*, 325 Or. 358, 363-64, 937 P.2d 1019 (1997); *Andrews v. Sandpiper Villagers, Inc.*, 215 Or. App. 656, 663-64, 170 P.3d 1098 (2007); *Dalton v. Robert Jahn Corp.*, 209 Or. App. 120, 136-37, 146 P.3d 399 (2006). Under the evidence before the court, there can be no question that the only practical construction of the parties agreement was that Plaintiff would be paid commissions for his sales to Nordstrom, but servicing Nordstrom Rack orders was an additional duty of Moholt's under the contract for which no additional compensation would be paid. That is evidenced by the uninterrupted course of performance where plaintiff received no such commissions and never complained.

Moholt's claim for commissions for February 2009 is untenable because no one at Dooney & Bourke ever agreed to pay a 2.5% commission on those sales. This is simply a percentage made up by Moholt. He can hardly claim that he developed this alleged expectation at the time based on knowledge that Dooney & Bourke regularly paid other sales representatives 2.5% in commissions, because it is undisputed that Dooney & Bourke did not regularly make such payments. Nor did Dooney & Bourke ever publicize to Moholt or anyone else that it made a special, one-time payment to Bob Goodwyn for sales to Stein Mart. Any rumors Moholt may have heard after he was terminated could not possibly create a contract expectation before then. Moholt is thus left with a situation where he is trying to enforce a supposed commission agreement for a one-month period when he has no proof that any agreement was ever reached on the single most material term, the amount of the commission. *See Long*, 1990 WL 56832, *2,

*Wasserburger*, 267 Or. at 82.  Failure to agree on the essential term of payment generally renders an asserted contract unenforceable.  *Ford v. Blinn*, 50 Or. App. at 519-20.

## IV.    CONCLUSION

For all of the above reasons, the court should find that Plaintiff Ron Moholt was an independent contractor and that he is owed nothing by Dooney & Bourke, and hold that he is not entitled to penalty wages or attorney fees.

DATED: February 9, 2015.

TONKON TORP LLP

By_____/s/ Colin Love-Geiger_____
    Scott G. Seidman, OSB No. 833209
     Direct Dial:  503.802.2021
     Fax:  503.972.3721
     E-Mail:  scott.seidman@tonkon.com
    Colin Love-Geiger, OSB No. 094253
     Direct Dial:  503.802.2091
     Fax:  503.972.3791
     E-Mail:  colin.love-geiger@tonkon.com

Attorneys for Defendant

036591/00001/6195497v1